IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLORENTINO JAVIER,<br><br>  Plaintiff,<br><br>  v.<br><br>ASSURANCE IQ, LLC, et al.,<br><br>  Defendants. | Case No. 20-cv-02860-CRB<br><br>**ORDER GRANTING MOTION TO DISMISS** |

Defendants Assurance IQ, LLC and ActiveProspect (together, "Defendants") bring their fifth motion to dismiss Plaintiff Florentino Javier's complaint in this case. See Mot. (dkt. 84). Because Javier has failed to cure the defects outlined in the Court's prior order, Defendants' motion is GRANTED, and Javier's claims are dismissed without leave to amend.

In its prior order, the Court held that Javier's claims are barred by CIPA's one-year statute of limitations, because he had constructive notice of Assurance's privacy policy, which stated that Assurance "may use third party vendors to assist" with "monitoring and analyzing Site activity." Javier v. Assurance IQ, LLC, No. 20-CV-02860-CRB, 2023 WL 114225, at *8 (N.D. Cal. Jan. 5, 2023) ("Javier IV"). This meant that Javier was on inquiry notice that a third-party vendor like ActiveProspect may have been another "potential cause[] of [his] injury." Id. (quoting Raifman v. Wachovia Securities, 649 F. App'x 611, 613 (9th Cir. 2016)). "Because it [was] not clear that this defect [could] [not] be cured by amendment," the Court granted Javier leave to amend his delayed discovery allegations. Id. at *9.

Javier amends his complaint in two key ways: First, he no longer "inadvertently"

brings a direct wiretapping claim against Assurance IQ, now asserting that he knew his information was being collected by Assurance, but only to provide him with a life insurance quote, TAC (dkt. 79) ¶ 63;[1] and second, he asserts that he first began receiving telemarketing calls in February 2020, TAC ¶ 58.[2]

I.   DISCUSSION

Javier makes three arguments for why these amendments suffice to invoke the delayed discovery doctrine. First, relying on Franklin v. Ocwen Loan Servicing, LLC, No. 18-cv-03333-SI, 2018 WL 5923450 (N.D. Cal. Nov. 13, 2018), he argues that because he now only pleads a wiretapping claim against ActiveProspect, he had no reason to suspect ActiveProspect's involvement in the collection of his information until April 2020, when he first received the recording of his website visit. See Opp'n (dkt. 87) at 1. Second, relying on Berman v. Freedom Financial Network, LLC, 30 F.4th 849 (9th Cir. 2022), Javier argues that the design of Assurance's webform did not put him on notice of the Privacy Policy, and thus it could not provide constructive notice of ActiveProspect's data collection. Id. at 1–2. Third, even if Javier was on notice of the Privacy Policy's existence, it did not disclose ActiveProspect's wiretapping. Id. at 2. Each of these arguments fails to persuade.

A.   **Franklin Still Does Not Support Javier's Delayed Discovery Allegations**

First, just as Franklin failed to support Javier's argument in the Court's prior order,

---

[1] It beggars belief that Javier—in two prior complaints, three orders on motions to dismiss, and one appeal—"inadvertently" brought a direct wiretapping claim against Assurance. See SAC (dkt. 38) ¶ 76; FAC (dkt. 24) ¶ 63. But contradictory allegations are nonetheless allowed in amended pleadings. See PAE Gov't Servs., Inc. v. MPRI, Inc., 514 F.3d 856, 859–60 (9th Cir. 2007) ("[T]here is nothing in the Federal Rules of Civil Procedure to prevent a party from filing successive pleadings that make inconsistent or even contradictory allegations."). But see Reddy v. Litton Indus., Inc., 912 F.2d 291, 296 (9th Cir. 1990) ("It would not be possible for Reddy to amend his complaint . . . without contradicting any of the allegations of his original complaint.").

[2] On a motion to dismiss, the Court cannot and does not rely on Defendants' assertion that Javier received telemarketing calls prior to February 2020. See Swenson Decl. (dkt. 84-1) ¶ 7. But it is at least a little odd that—miraculously for his delayed discovery argument—Javier did not receive telemarketing calls until thirteen months after he requested an insurance quote on Assurance's webform.

2

it still fails to support his argument now. While Javier now does not plead a direct wiretapping claim against Assurance, he still pleads that he did not know his information was "being collected by <u>anyone</u>—let alone a third party like ActiveProspect—for purposes other than providing [Javier] with a life insurance quote." TAC ¶ 63 (emphasis added). But at the end of the webform Javier received notice of Assurance's privacy policy, which discloses both that Assurance <u>and</u> third party vendors may use Javier's information for purposes other than providing him directly with an insurance quote. See Swenson Decl. Ex. B at 1 (listing ten ways Assurance may use Javier's information); <u>id.</u> ("We may use third party vendors to assist us with . . . monitoring and analyzing Site activity . . . .").[3] <u>Franklin</u> involved a series of fully recorded phone calls for which the plaintiff sometimes received no recording disclosure at all, or occasionally received a recording disclosure halfway through the call. <u>Franklin</u>, 2018 WL 5923450, at *3. Judge Illston thus held that those disclosures did not put that plaintiff on notice that his calls were being <u>fully</u> recorded, because "[t]he very nature of plaintiff's allegations is that the recordings were done surreptitiously." <u>Id.</u> Such that there was anything "surreptitious" about ActiveProspect's recording of Javier's actions on Assurance's webform "in real time," his required assent to the privacy policy means that Javier received constructive notice that (1) Assurance would use his information for purposes other than to provide him with an insurance quote; and (2) third parties may "assist" Assurance with "monitoring and analyzing Site activity." Swenson Decl. Ex. B at 1. Thus, as discussed in the Court's prior order, <u>Franklin</u> is inapplicable. <u>See</u> <u>Javier IV</u>, 2023 WL 114225, at *8.

### B.     The Webform's Design Put Javier on Notice of the Privacy Policy

Second, the design of Assurance's webform put Javier on notice of the privacy policy. As Judge White held in the first order in this case, Javier consented on a "clean and uncluttered page, while having the full ability and immediate opportunity to read the

---

[3] Further, if Javier did not receive a telemarketing call regarding his request for an insurance quote until thirteen months later, that might have also signaled that his information was being used for a different purpose.

privacy policy." Javier v. Assurance IQ, LLC, No. 4:20-CV-02860-JSW, 2021 WL 940319, at *3 (N.D. Cal. Mar. 9, 2021). Berman v. Freedom Financial Network does not hold to the contrary—in fact, Berman provides more support for Judge White's holding. 30 F.4th 849 (9th Cir. 2022). Under Berman, a "clickwrap" agreement may only be enforced where "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." Id. at 856. Berman held that the clickwrap agreement in that case did not meet this standard because the link to the terms and conditions to which the user allegedly agreed "was printed in a tiny gray font considerably smaller than the font used in the surrounding website elements . . . barely legible to the naked eye." Id. at 856–57. Further, the website did not state that clicking the button (with the text "Continue") manifested assent to the terms and conditions. Id. at 858.

The "clickwrap" agreement in this case has none of the issues that concerned the Berman Court: The agreement states, in legible font, that by clicking "View my Quote," the user "provide[s] [their] electronic signature as an indication of [their] intent to agree to this website's Privacy Policy [and] Terms of Service," Swenson Decl. Ex. A; and the privacy policy and terms of service are in blue font, the universal signal of a hyperlink on the internet, see Berman, 30 F.4th at 857. Thus, even under Berman, by clicking "View my Quote," Javier was on notice of Assurance's privacy policy, even if he chose not to read it.

### C. The Privacy Policy Disclosed Evidence Sufficient to Put Javier on Inquiry Notice of a Wiretapping Claim

Third, and finally, the privacy policy disclosed enough evidence of ActiveProspect's monitoring to put Javier on inquiry notice of a wiretapping claim.[4] Javier argues that because the privacy policy is written in the present tense, it does not put Javier

---

[4] The fact that Assurance may have made its privacy policy more explicit after Javier filed this action, see TAC ¶ 69, has no bearing on whether the original privacy policy provided sufficient notice of ActiveProspect's monitoring. Cf., e.g., Fed. R. Evid. 407.

4

1  on notice that the information he provided Assurance in the past—the "past" being the past
2  few minutes—would be used in the manner discussed in the privacy policy.  Even taking
3  as true the maxim "[t]he present tense usually does not refer to the past," see, e.g., Vaughn
4  v. Tesla, Inc., 87 Cal. App. 5th 208, 223 (2023), the Court must also follow the instruction
5  that "[t]he whole of a contract is to be taken together, so as to give effect to every part, if
6  reasonably practicable, each clause helping to interpret the other." Id. at 219 (quoting Cal.
7  Civ. Code § 1641).

8        Taking the language in the policy as a whole, the idea that it is not meant to apply to
9  the information Javier had just provided to Assurance in its webform is absurd.  The policy
10 begins with its scope: It "describes the information that we collect from you when you use
11 our Site or our Services and what we do with this information." Swenson Decl. Ex. B.
12 This indicates that the privacy policy applies during all "use" of Assurance's website,
13 whether that "use" occurred before or after the user reviewed the policy.  The policy
14 further states that Assurance may learn information about users when they "request
15 information about [its] Services or products," as Javier did when he requested an insurance
16 quote.  Swenson Decl. Ex. B.  It states that Assurance "may collect" particular information
17 like his "name, address, date of birth, phone number, email address, height, weight, social
18 security number, vehicle details, personal and family health information, arrest records,
19 credit score, properties you own or rent, and similar information about family members
20 and dependents," id.; just moments before, Assurance's webform had asked about Javier's
21 gender, his tobacco use, his marriage status, whether he has children, his date of birth, his
22 height and weight, his medical information, and his contact information.  TAC ¶¶ 39–45.
23 Finally, the policy notes that it "may use third party vendors to assist" with the services it
24 provides, including "monitoring and analyzing Site activity." Swenson Decl. Ex. B.
25 Taking these statements together, the only reasonable interpretation of the policy is that
26 such "monitoring and analyzing" may occur before, during, and after the user reviews the
27 privacy policy at the end of the webform.
28       Javier finally contends that the privacy policy does not provide notice that a third

party like ActiveProspect would have been recording his actions on the website "in real time," before he clicked "View my Quote." Opp'n at 9–10. But this is why the privacy policy triggers <u>inquiry</u> notice. Javier states that he did not believe that "anyone" was using his data for any purpose other than to provide him with an insurance quote. See TAC ¶ 63. The privacy policy, to which he assented by clicking "View my Quote," tells him categorically that his data may be used for other purposes and shared with third parties to be used for other purposes. Thus, he was on inquiry notice of a wiretapping claim against a third party like ActiveProspect, even if he did not know the third party's identity, or the full extent of the wiretapping involved. At that point, a reasonable investigation would have easily revealed (and eventually did reveal) those additional facts supporting Javier's wiretapping claims.

Accordingly, because Javier again fails to plead facts sufficient to invoke the delayed discovery rule, Defendants' motion is granted.[5]

## II.   CONCLUSION

For the foregoing reasons, Javier's claims are dismissed without leave to amend.[6]

**IT IS SO ORDERED.**

Dated: June 9, 2023

CHARLES R. BREYER
United States District Judge

---

[5] Because the Court resolves this motion on delayed discovery grounds alone, it need not address Defendants' arguments that Javier's communications were not intercepted "in transit." See Mot. at 11–14. In any case, the Court addressed that argument in a related action, <u>Hazel v. Prudential Financial</u>, 22-cv-7465-CRB, and there is no need to repeat those conclusions here.

[6] In addition to amending his complaint to provide new delayed discovery allegations, Javier also raises his entitlement to attorneys' fees under Cal. Civ. Code § 1021.5. TAC ¶¶ 72–79. The Court's prior order granted Javier leave to amend only his "delayed discovery allegations," not to add new allegations related to relief. <u>Javier IV</u>, 2023 WL 114225, at *9. When leave to amend is granted with limitation, a court may strike new allegations outside the scope that limitation. See, e.g., <u>Vahora v. Valley Diagnostics Lab'y Inc.</u>, No. 1:16-CV-01624-SKO, 2017 WL 2572440, at *2–4 (E.D. Cal. June 14, 2017). These allegations are so stricken.